## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RED, WHITE & BOOZE, LLC,
CHARLES L. COLLOM, AND
HELEN COLLOM,

      Plaintiffs,

v.                                                                          Case No. 8:23-cv-2704-KKM-AAS

CITY OF ST. PETE BEACH,
FLORIDA,

      Defendant.

_____

## <u>ORDER</u>

"Music is the universal language of mankind." HENRY WADSWORTH
LONGFELLOW, OUTRE-MER: A PILGRIMAGE BEYOND THE SEA 197
(Houghton, Mifflin & Co. 1894) (1835). This case is about what composes
that "universal language." A city-issued permit allows a restaurant to
play outdoor music using only string instruments and allows amplified
music for only a few hours each weekend. The restaurant contends that
these conditions regulate musical expression based on its content and do
not survive First Amendment scrutiny, and it seeks a preliminary
injunction. Mot. for Prelim. Inj. (MPI) (Doc. 48). Because I conclude that

the permit's prohibition of certain kinds of instruments is a content-based restriction on First Amendment-protected expression and the city fails to show that the conditions survive strict scrutiny, I preliminarily enjoin the city from enforcing parts of the permit.

## I.    BACKGROUND

Charles and Helen Collom own and operate Red, White & Booze, LLC, a waterfront seafood restaurant in the Pass-a-Grille neighborhood of St. Pete Beach. Collom Aff. (Doc. 48-1) ¶ 3. In 2022, the Colloms acquired the restaurant, formerly called "Sea Critters," intending to update and "revive the [aesthetics] of both the building and the surrounding area." *Id.* ¶¶ 4–5. They planned for the restaurant to have, as Sea Critters had, "an outdoor dining area for . . . patrons . . . to enjoy St. Pete Beach's weather and to have outdoor music." *Id.* ¶ 6. I refer to the plaintiffs collectively as "the Restaurant."

The City of St. Pete Beach notified the Restaurant that, under the City's Land Development Code, it needed a conditional use permit to play live music outside. *See id.* ¶¶ 8, 10, 18; *see also* St. Pete Beach, Fla., Land Dev. Code §§ 4.1, 15.4(n), https://perma.cc/VMX9-DDLT, https://perma.cc/56HQ-DH4G. The Restaurant disagreed but applied for

a permit anyway and, after some back and forth, the City issued one. *See* Collom Aff. ¶¶ 10–16.

The permit came with several conditions. *See id.* ¶ 16. First, "only acoustic string instruments shall be permitted to be played in the [Restaurant's] outdoor areas." Conditional Use Permit (CUP) (Doc. 48-1 at 7–10) ¶ 3. Those instruments must be unamplified, and no amplification equipment may "pipe music from the indoor area into the outdoor areas of [the] property." *Id.* ¶¶ 4–5. Next, the permit included time limits. Acoustic outdoor music may be played Wednesday through Friday evenings and on weekends from roughly noon to ten PM. *Id.* ¶ 6. "[A]mplified outdoor music" may be played only from twelve to three PM on Saturday and Sunday. *Id.* ¶ 8. Yet that allowance is still limited to string instruments; no bass is permitted, and percussion instruments are specially prohibited. *Id.* ¶ 8 ("Under no circumstances shall the playing of acoustic drum sets or percussive instruments that repetitively produce similar impulsive sounds be permitted without amendment of this conditional use permit by the City Commission."). Finally, the permit limited the decibel levels as to all outdoor music. *Id.* ¶ 7. For music within ten feet from any outdoor speaker, no more than 70 dBA, and for music

3

reaching the property line of any abutting residential property, no more than 55 dBA. *Id.*

The Restaurant objected that these conditions are unconstitutional. Collum Aff. ¶ 17. When the City disagreed, the Restaurant sued, challenging both the permit and the permitting scheme itself, as well as the City's sign code.[1] Am. Compl. (Doc. 20); *see* Compl. (Doc. 1). The parties sought a stay while engaging in settlement negotiations, *see* (Docs. 31, 33); *see also* (Docs. 35, 37, 44), and I lifted the stay after they failed to make progress, *see* (Doc. 46); *see also* (Doc. 45). The Restaurant now moves for a preliminary injunction restraining the City from enforcing many of the permit's conditions on playing outdoor music. *See* MPI. The City opposes. *See* Resp. (Doc. 51).[2]

---

[1] While the Restaurant references the sign-code challenge in the preliminary injunction motion, the motion includes no argument on that point. *See* MPI at 8–11. The challenge to the sign code is thus waived for purposes of interim relief. *See Kelliher v. Veneman*, 313 F.3d 1270, 1274 n.3 (11th Cir. 2002) (concluding that argument referenced in brief without elaboration was waived). To the extent it is not waived, the Restaurant has not shown a substantial likelihood of success on the merits by failing to analyze the constitutional challenges to the sign code.

[2] The parties agree that an evidentiary hearing is unnecessary to resolve the motion. (Doc. 50).

## II.    LEGAL STANDARD

To receive a preliminary injunction, a movant must establish (1) "a substantial likelihood of success on the merits"; (2) "irreparable injury" without an injunction; (3) "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## III.    ANALYSIS

The Restaurant contends that the permit's restrictions on the kinds of permissible instruments, as well as the limitations on amplification and bass, are presumptively unconstitutional content-based restrictions on First Amendment-protected expression. MPI at 10–11. It also challenges the permitting scheme as facially unconstitutional. *Id.* at 8–10. Because I agree that the permit regulates protected expression based on its content, I grant the motion without reaching the facial challenge.

## A. The Restaurant is Likely to Succeed on the Merits Because the Permit Restricts Music Based on Its Content

The First Amendment protects the instrumental part of music, regardless of whether the piece includes lyrics. To regulate the kinds of instrumental sounds that compose a musical work or performance is to regulate music based on its content. Because the permit does just that, it must survive strict scrutiny. It does not. The Restaurant has thus shown a substantial likelihood of success on the merits.

### 1. The First Amendment Protects Instrumental Music, Not Just Lyrics

The First Amendment protects music, including instrumental music. *See Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) ("Music, as a form of expression and communication, is protected under the First Amendment."); *Miller v. Civ. City of S. Bend*, 904 F.2d 1081, 1096 (7th Cir. 1990) (Posner, J., concurring) ("[I]t [is] implausible to suppose that the [*Ward*] Court thought it was speaking only of vocal music."), *rev'd sub nom. Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991). Yet while instrumental music is "unquestionably shielded" by the First Amendment, *see Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336 (11th Cir. 2021) (quoting *Fort Lauderdale Food Not Bombs v. City of Fort*

*Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018)), courts have been less than clear about why this is so.

The First Amendment presumptively protects speech when regulated "based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (explaining that strict scrutiny applies to "[c]ontent-based laws—those that target speech based on its communicative content"). Because instrumental music can be communicative in at least two ways apart from lyrics, it warrants First Amendment protection under precedent.[3]

First, instrumental music can communicate by association. *Cf., e.g.*, *W. Va. Bd. Of Educ. v. Barnette*, 319 U.S. 624, 632 (1943) ("Symbolism is a primitive but effective way of communicating ideas."). Certain tunes or

---

[3] For the reasons provided in this order, the logic of the Supreme Court's precedent about which speech is afforded protection under the Free Speech Clause dictates that content-based regulations of instrumental music must survive strict scrutiny. I have no occasion to consider whether, as an original matter, the Free Speech Clause protected against all kinds of content-based regulations of speech, whether linguistic or musical. *See, e.g.*, *Dershowitz v. Cable News Network, Inc.*, --- F.4th ----, 2025 WL 2585986, at *10–11 (11th Cir. 2025) (Lagoa, J., concurring) ("[T]he Founders simultaneously understood that freedom of speech was both a natural right not dependent on government creation, and also subject to certain limitations for the public good—so long as those limitations did not *abridge* the natural right as it existed in a system of natural law."). *See generally* Jud Campbell, *Natural Rights and the First Amendment*, 127 YALE L.J. 246 (2017).

musical arrangements, even those without words, can become associated with a concept or message such that the music itself carries that message independent of any verbal accompaniment. *See* Alan K. Chen, *Instrumental Music and the First Amendment*, 66 HASTINGS L.J. 381, 419 (2015) ("[P]urely instrumental music may have specific communicative qualities that are intended by the performer and widely understood by the intended audience."); David Munkittrick, Note, *Music as Speech: A First Amendment Category Unto Itself*, 62 FED. COMM. L.J. 665, 677 (2010). For example, John Phillips Sousa's "Stars and Stripes Forever," usually performed without its little-known lyrics, conveys a sense of American national pride through long association with patriotic occasions, even in listeners who may not know the song's patriotic name. And at least two courts have held that a public school may prohibit the performance of purely instrumental music because of the music's religious associations. *See Nurre v. Whitehead*, 580 F.3d 1087, 1093 (9th Cir. 2009) (upholding school's decision to prohibit performance of an instrumental arrangement of "Ave Maria"); *Stratechuk v. Bd. of Educ., S. Orange-Maplewood Sch. Dist.*, 587 F.3d 597, 601, 610 (3d Cir. 2009) (upholding school's ban on instrumental music associated with religious

holidays). Setting aside whether those cases correctly analyzed the schools' interests in maintaining religious neutrality, *cf. Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022), they evidence that instrumental music can communicate by association.[4]

Second, and perhaps more fundamentally, instrumental music is expressive in its own right. It can lift up or cast down the spirit, raise the mind to heaven or distract with terrestrial matters, and stir the human soul to heroic or base deeds, all of which prove instrumental music's power to communicate. Music can evoke these responses in a hearer "completely disassociated from titles, linguistic signals, and other forms of art." Chen, *supra*, at 431.

---

[4] Presumably, music has sufficient associative qualities to satisfy the general test that the Supreme Court uses for identifying protected symbolic speech. *See Texas v. Johnson*, 491 U.S. 397, 402–06 (1989) ("In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" (quoting *Spence v. Washington*, 418 U.S. 405, 410–11 (1974))); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 568–69 (1995); *Burns*, 999 F.3d at 1335 (assuming without deciding that this test applied to determining whether the First Amendment protects residential architecture). *But see* Chen, *supra*, at 388–90 (explaining that the Supreme Court has applied the test from *Johnson* and *Spence* somewhat inconsistently). Yet because, as explained below, all music has inherent communicative powers, music that might lack a symbolic or associative component is still protected.

The inherent power of instrumental music to communicate has been recognized for millennia and by many. *See, e.g.*, PLATO, THE REPUBLIC l. 401d (Allan Bloom trans.) ("[R]hythm and harmony most of all insinuate themselves into the inmost part of the soul."); ST. THOMAS AQUINAS, SUMMA THEOLOGICA Pt. II-II, Q. 91, Art. 2 (Fathers of the English Dominican Province trans.) ("[It] is evident that the human soul is moved in various ways according to various melodies of sound."). It affects us starting in our earliest years—even before birth—and any parent knows that children respond instinctively to music. *See, e.g.*, Ravindra Arya, et al., *Maternal Music Exposure During Pregnancy Influences Neonatal Behaviour: An Open-Label Randomized Controlled Trial*, 2012 INT'L J. OF PEDIATRICS, Feb. 14, 2012, at 1; Donna Brink Fox, *Music and the Baby's Brain*, 87 MUSIC EDUC. J., Sep. 2000, at 24 ("[I]t is very clear that babies are musical, that they have innate musical behaviors, and that they use music as meaningful communication in their earliest years of development."). According to one noted composer, music may be more precise than language in its ability to communicate feeling, even if its precise meaning is incapable of linguistic expression:

> People often complain that music is ambiguous, that their ideas on the subject always seem so vague, whereas every one

understands words; with me it is exactly the reverse; not merely with regard to entire sentences, but also as to individual words; these, too, seem to me so ambiguous, so vague, so unintelligible when compared with genuine music, which fills the soul with a thousand things better than words. What the music I love expresses to me, is not thought too *indefinite* to be put into words, but, on the contrary, too *definite*.

FELIX MENDELSSOHN, LETTER TO MARC-ANDRÉ SOUCHAY (OCT. 15, 1842), *reprinted in* LETTERS OF FELIX MENDELSSOHN BARTHOLDY FROM 1833 TO 1847 (Julius Rietz ed., Lady Wallace trans., 1863). This communicative part of instrumental music adds something to speech or lyrics already emotionally charged. As has been said in the context of religion, "[h]e who sings prays twice." CATECHISM OF THE CATHOLIC CHURCH 327 (2d ed., Doubleday 1997) (attributing this quote to St. Augustine of Hippo).[5] Instrumental music is thus inherently expressive and communicative. Indeed, making and listening to music is a fundamental part of being human.

Under the Supreme Court's First Amendment jurisprudence, the Constitution unquestionably protects instrumental music, not just lyrics.

---

[5] The first prayer is the verbal petition or adoration itself, while the second is the melody to which those words are sung—the musical part of singing, as opposed to the lyrics. This second part communicates over and above the written prayer.

The parties do not dispute this. The question here is largely what it means to regulate instrumental music based on its content.

### 2. A Regulation That Prohibits Certain Instruments or Amplification Restricts Music Based on its Content

To assess whether a regulation of musical expression comports with the First Amendment, a court must first determine whether the regulation is content based or content neutral. *Ward*, 491 U.S. at 791. "[A] law is content-*based* either (1) if it applies on its face to particular speech because of the topic discussed or the idea or message expressed or (2) if, though facially neutral, it cannot be justified without reference to the content of the regulated speech or was adopted by the government because of disagreement with the message the speech conveys." *Wacko's Too, Inc. v. City of Jacksonville*, 134 F.4th 1178, 1184–85 (11th Cir. 2025) (internal quotation marks omitted) (quoting *TikTok Inc. v. Garland*, 145 S. Ct. 57, 67 (2025)); *see also City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73–74 (2022); *Reed*, 576 U.S. at 163. Laws "that target speech based on its communicative content" "are presumptively unconstitutional" and subject to strict scrutiny. *Reed*, 576 U.S. at 163. Content neutral laws—those "justified without reference to the content of the regulated speech"—are subject to intermediate scrutiny. *Wacko's*

*Too*, 134 F.4th at 1185 (quoting *Ward*, 491 U.S. at 791). Yet neither the Supreme Court nor any federal court of appeals has explained how to determine whether a regulation of instrumental music is content based.

Music is "[t]he art or science of combining vocal or instrumental sounds to produce beauty of form, harmony, melody, rhythm, [and] expressive content." *Music*, THE OXFORD ENGLISH DICTIONARY, https://perma.cc/8VR5-L2QL.[6] Music's content, then, is the way in which different sounds are combined to create a particular expressive musical work. Thus, a regulation that prohibits certain musical combinations of sounds is content based, while a regulation that may be justified without reference to how sounds are combined to create instrumental music is not.

For example, the regulation in *Ward* was content neutral because it did not regulate which sounds may be used or how they may be arranged. In *Ward*, the Supreme Court upheld a New York City regulation requiring private parties renting a Central Park bandshell to use a city-provided technician and sound equipment to control noise.

---

[6] Music is thus distinguished from mere noise, which neither party contends warrants First Amendment protection. I have no cause here to examine where music ends and noise begins.

491 U.S. at 786–87. Because "the city require[d] its sound technician to defer to the wishes of event sponsors concerning sound mix" and the policy otherwise limited only noise levels, not what kinds of music the performers could play, the Court concluded that the regulation had "nothing to do with content." *Id.* at 792 (quoting *Boos v. Barry*, 485 U.S. 312, 320 (1988)).

Absolute noise levels themselves are not part of a musical work or performance's content. It is long settled that municipalities have a substantial interest in protecting their residents from excess noise, *see, e.g.*, *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805–06 (1984), and regulations limiting the absolute amount of sound (ordinarily quantified in decibels) are generally content neutral, *see, e.g.*, *Harbourside Place, LLC v. Town of Jupiter*, 958 F.3d 1308, 1316 (11th Cir. 2020); *Pine v. City of W. Palm Beach*, 762 F.3d 1262, 1275 (11th Cir. 2014); *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1268–69 (11th Cir. 2007). While someone could argue that a musical work conveys something by how loud the performers play it (what music theorists call "dynamics," *see Dynamics*, THE OXFORD COMPANION TO MUSIC (Alison Latham ed., 2011)), the loudness of a particular note is

14

relative to the rest of the sounds in a work or performance, *see, e.g.*, Erwin E. Gordon, *An Approach to the Quantitative Study of Dynamics*, 8 J. OF RSCH. IN MUSIC EDUC. 23, 23 (1960) (observing that conventional dynamic markers like *mezzo piano* ("medium soft") or *fortissimo* ("very loud") have no absolute value). Put another way, an orchestra that performs Strauss's *Also sprach Zarathustra*, with its dramatic crescendo,[7] must be allowed to increase its volume, but an upper limit on that increase does no violence to the music's content. Thus, while a regulation that required all music notes to be exactly thirty decibels (or zero) might be content based, ordinances prescribing loudness ceilings are not.

Ordinances that restrict which instruments may be used, on the other hand, distinguish based on a musical work or performance's content. One of the "large array of elements" that makes up a musical composition or performance is "timbre." *Swirsky v. Carey*, 376 F.3d 841, 849 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004). "Timbre," also known as "tone color," is the "quality of sound characteristic of a particular type of instrument or voice, as opposed to its register or pitch." *Tone-Colour*, THE OXFORD COMPANION TO MUSIC.

---

[7] Made famous in Kubrick's *2001: A Space Odyssey*.

Timbre is vital to a musical work. *See* Isabella van Elferen, *Timbrality: The Vibrant Aesthetics of Tone Color*, in THE OXFORD HANDBOOK OF TIMBRE 69 (Emily I. Dolan & Alexander Rehding eds., 2021) ("Timbre is one of the most important . . . aspects of musical aesthetics."). For example, while Beethoven's *Moonlight Sonata* (originally for piano) may be arranged for classical guitar, the piece's content is altered by the change in instrumentation. And one would be hard pressed to claim that Disturbed's heavy-metal cover of *The Sound of Silence* left unaltered the content of Simon & Garfunkel's original acoustic version.

Instruments are therefore integral to musical expression, not a mere medium of communication. Despite this conclusion, the City argues that strict scrutiny is not warranted under the Eleventh Circuit's decision in *Harbourside Place*. Resp. at 17–18. In *Harbourside Place*, the Eleventh Circuit faced a municipal regulation that distinguished between live and recorded musical performances. 958 F.3d at 1322. The court suggested that the Supreme Court's observation in *Turner Broadcasting System Inc. v. FCC*, 512 U.S. 622 (1994), that "[h]eightened scrutiny is unwarranted when the differential treatment is 'justified by some special characteristic' of the particular medium being regulated"

might apply to musical performances. *Id.* at 1321–22 (quoting *Turner Broad.*, 512 U.S. at 660–61).

Yet in *Turner Broadcasting*, the medium of communication was neatly severable from the message. The "must-carry" regulations there distinguished between broadcast and cable television but drew no distinctions as to the programing available on each. *See* 512 U.S. at 644 ("Nothing in the Act imposes a restriction, penalty, or burden by reason of the views, programs, or stations the cable operator has selected or will select."). And the appellants in *Turner Broadcasting* did not argue that the cable versus broadcast delivery of television programing somehow altered or contributed to the programing's message or expressive content. *See generally id.* Instruments, on the other hand, deeply affect a musical work's expressive content. *Turner Broadcasting* is uninstructive.

The City also presents *Harbourside Place* as "suggesting [a] distinction" "between live and recorded music" "was content-neutral," Resp. at 17, yet the Eleventh Circuit made clear that it "d[id] not definitively decide whether [a ban on only live music] is on its face a content-based or content-neutral regulation of speech," *Harbourside Place*, 958 F.3d at 1322. Regardless, a regulation banning particular

instruments is different in kind than a regulation banning the live performance of those same sounds.

The City relies on two other cases to resist the conclusion that instrument-based regulations are content based. *See* Resp. at 17. First, in *Casey v. City of Newport*, 308 F.3d 106, 109, 120 n.10 (1st Cir. 2002), the First Circuit held that a regulation that banned singing but allowed unamplified instrumental music was content neutral because nothing suggested that the municipality enacted the regulation based on "the content of [a singer]'s performances" or specific animus toward singing as opposed to other forms of musical expression. Since *Casey* was decided, though, the Supreme Court has made clear that "[i]nnocent motives do not eliminate the danger of censorship presented by a facially content-based statute." *Reed*, 576 U.S. at 167. Second, *Stokes v. City of Madison*, 930 F.2d 1163, 1171–72 (7th Cir. 1991), likewise focused on the purpose of the government's regulation—there, regulating noise (both music and non-music) based on "the decibel level and the sheer consciousness-piercing quality of the sound." Neither of these cases addressed under current precedent whether an instrument-based regulation is content based.

While the City does not address it, instrument-based regulations pose a real risk of "excising certain ideas or viewpoints from the public dialogue." *Wacko's Too*, 134 F.4th at 1185 (quoting *TikTok*, 145 S. Ct. at 67). Regulations of instruments (or other components of music) might have the effect—or be enacted for the purpose—of suppressing musical expression that depends on those instruments. In the case of New York City's cabaret laws, for example, a city regulation "permit[ed] only a piano, organ, accordi[o]n, guitar or string instrument" in jazz clubs and coffeehouses. *Chiasson v. N.Y.C. Dep't of Consumer Affs.*, 505 N.Y.S.2d 499, 501 (Sup. Ct. 1986). Though these regulations spoke in "a lingua franca of zoning policy," they were at least arguably motivated by "racism, the contempt for vernacular arts, [and] the fear of what is oppositional or bohemian," including the desire to suppress jazz music. Trey Hatch, Note, *Keep on Rockin' in the Free World: A First Amendment Analysis of Entertainment Permit Schemes*, 26 COLUM. J.L. & ARTS 313, 326 (2003) (quoting PAUL CHEVIGNY, GIGS: JAZZ AND THE CABARET LAWS IN NEW YORK CITY 124 (1991)). A New York court ultimately refused to enforce the instrument-based restriction, *see Chiasson*, 505 N.Y.S.2d at

19

503, and the city removed it, *see Chiasson v. N.Y.C. Dep't of Consumer Affs.*, 524 N.Y.S.2d 649, 650 (Sup. Ct. 1988).

To be sure, there is no allegation here that any impermissible purpose motivated the City. Based on the record that the parties submitted, noise reduction, particularly near residential areas, seems to be the goal. Yet "[i]nnocent motives do not eliminate the danger of censorship presented by a facially content-based [rule], as future government officials may one day wield such statutes to suppress disfavored" expression. *Reed*, 576 U.S. at 167. Instruments are central to music's communicative content, and instrument-based regulations, even if enacted for a content-neutral purpose, risk suppressing musical expression based on "its message, its ideas, its subject matter, or its content." *Id.* at 163 (quoting *Police Dep't of Chi. v. Mosley,* 408 U.S. 92, 95 (1972)).

To sum up, a statute or rule that regulates how musical sounds may be arranged, or what sounds may be used, regulates music based on its content. That includes regulation of instruments but does not include absolute limits on volume. Such regulations are facially content based.

Applying these principles to the permit, I conclude that the challenged conditions are content-based restrictions on First Amendment-protected expression. Recall, the permit generally allows the Restaurant to play only unamplified acoustic string instruments, except during a few hours on Saturdays and Sundays. *See* CUP ¶¶ 3–4, 6, 8. It also prohibits the Restaurant from playing at any time any "acoustic drum sets or percussive instruments that repetitively produce similar impulsive sounds." *Id.* ¶ 8. During the weekend time slots, the permit allows amplification but only for string instruments and never with any bass. *Id.*

These requirements regulate musical expression based on its content.[8] As explained above, restrictions on instruments are content based, and the permit allows only string instruments, *see* CUP ¶¶ 3–4, 8. The restriction on bass likewise regulates music based on the sounds that compose it. *See id.* ¶ 8; *Bass*, THE OXFORD DICTIONARY OF MUSIC (6th ed., Joyce Kennedy, Michael Kennedy, & Tim Rutherford-Johnson eds., 2012)

---

[8] The City argues that the Restaurant "cannot credibly contend that the date, time, and decibel restrictions are content-based." Resp. at 16. True, but the Restaurant does not challenge those portions of the permit, at least for purposes of interim relief. *See* MPI at 10–11.

(defining "bass" as the "[l]owest regions of musical pitch"). And the restriction on amplification is, at least as defined, an instrument restriction. The permit provides that an instrument is "amplified" if it uses "separate equipment" "to increase the decibel level of [the] instrument above that created by in-body vibration due to strumming, bowing or plucking of the instrument." *Id.* ¶ 4. This broad rule prohibits instruments that require external amplification to make sound at all, even disregarding the string-instruments restriction. *See Casey*, 308 F.3d at 121 (McAuliffe, J., concurring) ("In the world of modern music, 'amplified' is not synonymous with 'made louder.' Electronic musical instruments can only produce sound through a process of electronic amplification, but those instruments are not inherently louder than acoustic or unamplified instruments."). All these restrictions therefore face strict scrutiny. *See Reed*, 576 U.S. at 169.

### 3. The City's Permit Does Not Survive Strict Scrutiny

Because the City contends that intermediate scrutiny applies, the City does not argue that the permit survives strict scrutiny. *See* Resp. at 18–19. Accepting that the City has a compelling interest in limiting excessive noise, *cf. Taxpayers for Vincent*, 466 U.S. at 805–06 (explaining

that municipalities have "a substantial interest in protecting [their] citizens from unwelcome noise"), nothing in the record shows why a total ban on non-string instruments and bass and a capacious limitation on amplification is "the least restrictive means of" doing so, *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2302 (2025) (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)). That conclusion is hardly surprising, given that the Supreme Court has only once held that a law triggered yet survived strict scrutiny in the First Amendment context. *Id.* at 2310 (citing *Holder v. Humanitarian L. Project*, 561 U.S. 1, 27–39 (2010)). The Restaurant has therefore made a substantial showing that the permit violates its First Amendment right to free speech and that it is likely to succeed on the merits.

## B. The Restaurant Will Suffer Irreparable Harm Absent an Injunction

Courts usually presume that the deprivation of First Amendment rights irreparably harms a plaintiff. *See Elrod v. Burns*, 427 U.S. 347, 373–74 (1976); *Wacko's Too, Inc. v. City of Jacksonville*, 658 F. Supp. 3d 1086, 1128 (M.D. Fla. 2023), *aff'd*, 134 F.4th 1178. The City never rebuts that presumption. *See* Resp. This factor therefore favors the Restaurant.

## C. The Equities and the Public Interest Favor Injunctive Relief

The City offers no argument about any prejudice it would suffer from an injunction preventing the enforcement of the permit's restrictions on non-acoustic instruments and amplification vis-à-vis the Restaurant. *See* Resp. And the continued validity of the permit's restrictions on absolute noise levels abates any concern about disturbances related to loud music. *See* CUP ¶ 7 ("Outdoor music shall not exceed [the specified decibel level] at any hour in which music is permitted."). Finally, the public interest always favors the protection of First Amendment rights. *See Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001) ("[T]he public interest is always served in promoting First Amendment values."). These two factors also weigh in the Restaurant's favor.

## IV.   CONCLUSION

Plaintiffs Red, White & Booze LLC, Charles Colom, and Helen Colom have carried their burden as to all four equitable factors. I find that a preliminary injunction is warranted. An injunction against enforcement of only the permit's impermissible content-based restrictions offers the narrowest equitable relief. *See Georgia v. President*

24

*of the U.S.*, 46 F.4th 1283, 1303 (11th Cir. 2022) ([R]emedies should be 'limited to the inadequacy that produced the injury in fact that the plaintiff has established,' and 'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.' " (quoting *Gill v. Whitford*, 585 U.S. 48, 50 (2018))); *see also Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 921 (2024) (Gorsuch, J., concurring in the grant of stay) ("Ordinarily, [preliminary injunctions] may go no further than necessary to provide interim relief to the parties.").

The following is therefore **ORDERED:**

1.  The plaintiffs' Motion for Preliminary Injunction (Doc. 48) is **GRANTED in part**.

2.  The City of St. Pete Beach, Florida, and its officers, agents, servants, and employees are partially **ENJOINED** from enforcing against the plaintiffs—Red, White & Booze, LLC, Charles L. Collom, and Helen Collum—the City's Development Order – Conditional Use Permit #23034 (Doc. 48-3) in violation of the plaintiffs' First Amendment rights. The City may not:

a.  Enforce the permit's limitation to the use of acoustic string instruments. *See* CUP ¶¶ 3–4, 6.

b.  Enforce the permit's limitation on the playing of amplified outdoor music. *See* CUP ¶¶ 4–5, 8.

c.  Enforce the permit's ban on "bass" or "acoustic drum sets or percussive instruments that repetitively produce similar impulsive sounds." CUP ¶ 8.

3.  This preliminary injunction shall not be construed to prohibit the City from enforcing either the general time restrictions for playing outdoor music (amplified or unamplified), *see* CUP ¶ 6, or the general decibel limits, *see* CUP ¶ 7. Nor shall it be construed to restrict the City's enforcement of other permit requirements not discussed in this order.

4.  This preliminary injunction will remain in force during the pendency of this action or until further order of this Court.

**ORDERED** in Tampa, Florida, on September 16, 2025.

Kathryn Kimball Mizelle
United States District Judge

26